SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
ORI KATZ, Cal. Bar No. 209561
ROBERT K. SAHYAN, Cal. Bar No. 253763
MATT R. KLINGER, Cal. Bar No. 307362
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
Telephone:    415.434.9100
Facsimile:    415.434.3947
Email:    okatz@sheppardmullin.com
    rsahyan@sheppardmullin.com
    mklinger@sheppardmullin.com

Proposed Counsel for Debtor PopExpert, Inc.

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>PopExpert, Inc.,<br><br>        Debtor. | Case No. 16-30390<br><br>Chapter 11<br><br>**DECLARATION OF INGRID SANDERS IN SUPPORT OF DEBTOR'S BANKRUPTCY FILING AND FIRST DAY RELIEF**<br><br>Date:    TBD<br>Time:    TBD<br>Judge:    Honorable Hannah Blumenstiel<br>Place:    450 Golden Gate Avenue<br>        Courtroom 19<br>        San Francisco, CA 94102 |

I, Ingrid Sanders, declare:

1. On the day hereof, PopExpert, Inc., the above-captioned debtor ("PopExpert" or the "Debtor"), filed in this district a voluntary petition for relief under chapter 11 of title 11 of the United States Code, commencing the above-referenced chapter 11 case (the "Bankruptcy Case"). I am authorized to submit this declaration in support of the Debtor's chapter 11 petition and the first day pleadings described here. Except as otherwise noted, I have personal knowledge of the statements set forth in this declaration. As to those matters based on information and belief, I believe them to be true. If called upon to do so, I could and would testify competently to the matters set forth in this declaration.

2. I serve as the Debtor's Chief Executive Officer and the sole remaining member of its board of directors. I submit this declaration to provide relevant background information and assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of this Bankruptcy Case and in support of the Debtor's voluntary petition for relief on the date hereof (the "Petition Date") and the relief, in the form of motions and applications, that the Debtor has requested of the Court.

## Company Background

3. PopExpert develops and operates a number of internet platforms that provide on demand access to lifelong learning. Its platforms enable customers to learn from top experts around topics that help customers improve at life, work and play.

4. On popexpert.com individuals can connect with experts for live and one-to-one video lessons in several subject areas. The subject areas generally involve topics of emotional intelligence or emotional quotient (EQ), such as meditation, nutrition, relationships, productivity, career mentoring, language, music, and style. The experience on the PopExpert website (www.popexpert.com) allows users to book and pay for lessons, and video chat, all from their accounts, as well as to sign up for on demand online workshops in various topics. Customers can access the company's website and search for a subject, such as yoga, where they find a list of experts that are validated with credentials

and tagged with a price per session. From there, customers can choose the expert they prefer, schedule a session, and start the learning experience. PopExpert facilitates payment using online service providers, so the entire process can be completed in one place online. The elearning institute platforms currently include the Online Marketing Institute at www.onlinemarketinginstitute.co and the Mindful Institute at www.mindfulinstitute.co where consumers can sign up for unlimited monthly or annual subscription access to hundreds of video lessons or purchase a certification. Additionally, the company creates private elearning portals for corporate clients to help training employees in particular topics. More information about this offering can be found at www.enterpriseinstitute.co.

5. Revenues are primarily generated through a single purchase of workshops and certifications, monthly and annual subscriptions and corporate license. Under the single purchase and subscription model, a fee is charged for access to specific classes, which is generally collected as a single product purchase or a monthly or annual subscription fee with an average cart value of $61 for individual customers. Under the corporate license model, a contract is generally established which provides for the creation of a private elearning portal for the employees client-company to have access to designated classes on demand with fees averaging $15,000 plus for these annual licenses. As shown in the budget attached hereto as **_Exhibit A_**, the company projects total revenue during the next 13 weeks to total approximately $100,000.

6. PopExpert is based in San Francisco, California. I became the company's founding CEO in 2012 following a life-changing sabbatical from a nearly 15-year long career primarily in advertising, technology and data. During my sabbatical, I focused primarily on health and wellness oriented subjects that I thought would help add value to my life experience as well as that of my family and friends. In preparation for the sabbatical I completed a 7-day silent meditation retreat, and as part of the focus of my sabbatical I obtained certification as a Yoga teacher with Jivamukti Yoga and as a Health Coach with the Institute of Integrative Nutrition. Having this opportunity to study with

talented experts and learn about the professional journeys of full-time teachers, coaches and experts was the inspiration behind popexpert.com.

7. In the preparation for PopExpert I was joined by PayPal co-founder Ken Howery with whom I had been discussing and working through the idea of starting a company focused on delivering expertise online for quite some time. We invited a former colleague of mine from Active Network, Jeremy Thomas, to join at the starting stage as Chief Technology Officer. The company's business concept and fundraising efforts garnered financial backing from several entrepreneurs and investors in Silicon Valley, New York and elsewhere, with most of whom I had built a personal and professional reputation over the course of years. The company raised $50,000 in an initial seed round of funding in November 2012, followed immediately by another round in the amount of $450,000 in December 2012. By the end of 2013, the company had secured additional funding of $1.715 million and in 2014 and 2015 took in an additional $675,000 from investors for an overall total of $2.89 million.

8. As is the case with many start-ups, the company's early focus was on building its platform and brand and developing an understanding of the needs of its customer base. During its first year, the PopExpert team had developed relationships with thousands of experts in primarily EQ topics and began publishing content created by these experts initially starting with articles and soon thereafter moving onto the creation of workshops. And during its first three years revenue grew from $30,000 (2013), to $50,000 (2014) to $900,000 (2015) as the customer base expanded, the brand gained greater acceptance and traction and the company expanded including through the acquisition of the Online Marketing Institute asset (described further below).

9. At its peak the company had 11 full-time employees and several contractors.

**Management**

10. In addition to myself, the company currently has two other employees responsible for marketing and operational matters after recent reductions due to budget constraints.

11. Prior to starting PopExpert, I was the Managing Director of Digital Strategy & Partnerships for TARGUSinfo (a provider of real-time, on-demand information and analytics services including Caller ID), where I helped establish a presence for the company in New York City and helped build a new division (AdAdvisor) that became a leading player in the emerging adtech ecosystem. TARGUSinfo was subsequently acquired by Neustar, Inc. in 2011.

12. Prior to my work at TARGUSinfo, I was the General Manager of Online Advertising for Active Network (a technology leader in activity & participant management software), where I led strategy and operations for the company's online advertising business and helped build a grassroots brand sampling program with the company's 15K event organizers. Active Network conducted an initial public offering in 2011.

13. Early in my career, I occupied various roles, including roles at brand strategy and digital marketing agencies and a four-month project with the United Nations Development Program to help build a global intranet connecting all country offices. My first professional job was with Prodigy Internet in the late 1990s where I first developed my passion for technology.

14. I hold a Bachelor of Journalism and Bachelor of Arts degrees from the University of Missouri-Columbia, and an MBA from SDA Bocconi, Italy's top business school and a program regularly ranked in the top 10 in Europe.

## Capital Structure

15. The Debtor has no secured debt. The Debtor's liabilities consist of approximately $8.45 million in unsecured claims. These liabilities break down roughly as follows: (i) approximately $205,000 in trade payables owed to vendors, experts and credit card companies; (ii) approximately $90,000 in payroll and expense reimbursement owed to employees (including insiders), (iii) approximately $150,000 cash promissory loan (iv) approximately $5 million on account of convertible promissory notes to seed investors, and (v) approximately $3 million on account of the OMC Notes (described below).

16. The Debtor's assets consist primarily of intellectual property, including the following web sites: www.popexpert.com, www.onlinemarketinginstitute.co, www.mindfulinstitute.co, and www.enterpriseinstitute.co, various related domain names, technology, class and content assets displayed on web properties, and computers and other equipment.

### The OMC Transaction

17. In August 2014, the company began searching for a new CEO to replace me, because I had expressed a desire to step out of that role and reduce my day-to-day responsibilities with the company.

18. Prior to this, the Company had started to invest in extending its business model to include elearning content that could help scale revenue and ultimately provide passive income back to experts and determined that this would be the focus of the next phase of investment as part of its continued growth strategy. To this end the Company began signing agreements with top experts to collaborate on the creation of "workshops" after the viability of this model was established through early testing and market feedback and was looking for additional opportunities to further scale this part of the business and develop or acquire certain assets that fit with the business strategy.

19. As the CEO search was underway, I reconnected with Aaron Kahlow ("Kahlow"), then the head of OMC, a California corporation ("OMC"), who expressed an interest in an opportunity to lead a company with bigger market potential. He also expressed an interest in selling an asset developed under OMC, the Online Marketing Institute ("OMI"), which provides on-demand elearning programs to small business and start-ups, agencies and consultants, consumer brands, and others.

20. After negotiations between the parties, PopExpert and OMC entered into a sale and purchase agreement for PopExpert's acquisition of certain assets of OMC, including the OMI portion of OMC's business. The acquisition closed at the end of 2014 (the "OMC Transaction").

21. As consideration for the transaction PopExpert made two promissory notes (together, the "OMC Notes") in favor of OMC. The first was a cash note in the face amount of $400,000. The second was a convertible note in the face amount of $3.6 million. Additionally, in connection with the OMC Transaction, Kahlow was hired as PopExpert's new CEO approximately two months prior to the official close of the transaction following a verbal agreement between the parties to the acquisition terms. He also became a member of PopExpert's board of directors.

**Management Restructuring**

22. Kahlow's brief tenure with PopExpert did not have the positive effect that the company hoped for. With Kahlow at the helm of the company, PopExpert's entire original team, with one exception, left the company. After a series of missteps, the board determined that it was in the best interest of the company to end Kahlow's association with the company, and he was given the option to resign. He agreed to resign. Following an exhausting negotiation process, a separation agreement was executed between Kahlow and the company in September 2015. Upon the resignation of Kahlow, I was asked to step back into the CEO role in an attempt to salvage the company.

23. Within seven days of fully executed signatures, Kahlow attempted to rescind the separation agreement and submitted a claim against the company with the California Labor Board. The company attempted to resolve the claim in good faith; however in the course of discussions it became clear that Kahlow had plans to make further claims against PopExpert. A hearing on this claim was scheduled in December 2015 before the California Labor Board. Kahlow failed to appear at the hearing, and the Labor Board decided in PopExpert's favor and closed the case. But the ordeal was not without cost to the company, as the distraction negatively impacted operations, caused the company to miss an opportunity to bring in capital from new investors, and the company was forced to invest in retaining counsel to prepare for and attend the Labor Board hearing.

24. I agreed to put my plans on hold and return as the company's CEO with the goal of preserving as much value as possible while the company explored its options. As

part of my efforts to help the company in its difficult time, I agreed to certain concessions including continuing to accept a lower salary ($110,000 compared to Kahlow's starting salary of $125,000 that was increased to $150,000 in April 2015), deferring a total of $65,000 in past-due wages and approximately $25,000 in unreimbursed business expenses, and continuing to be subject to joint liability for approximately $50,000 in company credit card balances, in part for balances that were incurred without my prior knowledge while Kahlow was CEO (in contrast to the company's prior practice to pay credit card balances in full each month). This agreement to put my plans on hold and carry financial burdens on behalf of the company was done at substantial personal hardship and economic cost, but I was willing to do so in an attempt to seek a positive outcome for all stakeholders.

**The OMC Litigation**

25. Many of Kahlow's decisions and actions were determined by the company to be improper and, in the company's view, breaches of fiduciary duty. In addition, the company believed that certain misrepresentations were made in connection with the OMC Transaction. As such, on December 14, 2015, PopExpert commenced a lawsuit against Kahlow and OMC in the superior court for the city and county of San Francisco, case #15-549394, seeking damages and asserting various causes of actions, including for breach of fiduciary duty, breach of contract, fraud, interference with prospective economic interest, and declaratory relief. OMC and Kahlow filed counter-claims, naming both the company and myself individually as a co-defendant, and asserted breach of contract, rescission, false promise, labor code violations, and declaratory and injunctive relief.

26. As of the Petition Date, the above litigation (the "OMC Litigation") remains pending before the superior court in its very early stages.

**Events Leading to the Bankruptcy Filing**

27. Due to mismanagement of the company during Kahlow's tenure, the company's growth momentum was degraded. Just prior to and after his departure, several matters came to light that contributed to turning the company from a budding innovative business to a company struggling to survive. The company learned, for example, that

while Kahlow was CEO substantial accounts payable liabilities were incurred but were not disclosed, projected revenue was substantially overestimated, key clients were not satisfied because what had been promised by Kahlow was different than what was ultimately delivered, the technology infrastructure was unstable, expert relationships were weak and the quality of content assets was not sufficient. This placed the company in a precarious situation in Q4 2015, and it became clear that significant efforts and resources were needed to remedy various aspects of the business, including content assets, technology infrastructure, and client relationships.

28. The company spent a substantial part of the period between August and December 2015 attempting to get back on track while dealing with challenges resulting from Kahlow's actions prior to and following his resignation. The recovery efforts at the end of 2015 created a significant drain on the company's already overtaxed management and limited resources, and the company missed two distinct opportunities to secure capital from new investors and lenders due to concerns regarding Kahlow's actions. And at the same time that the company was scrambling to stay on course following Kahlow's resignation, several significant obligations matured and a handful of the company's creditors started to take more aggressive steps to demand payment.

29. On March 31, 2016, a substantial note for investors matured. This note, which had previously been instrumental in the development of the Debtor's business, totals approximately $5 million including preferred payment and interest.

30. The Debtor has been unable to obtain financing or funding from alternative sources due in large part to the degradation of its business under Kahlow's leadership, the hostile actions taken by Kahlow following his resignation and the pending OMC Litigation.

31. Prior to filing this bankruptcy case the Debtor explored the option of selling its business and assets to potentially interested parties. Several parties have already expressed interest and have already discussed the potential for a transaction with the company. It became clear to the company, however, that such a transaction was not

-8-
SMRH:476472228.2                                                                     FIRST DAY DECLARATION
Case 16-30390    Doc# 6    Filed: 04/12/16    Entered: 04/12/16 15:18:41    Page 9 of 18

feasible outside of bankruptcy because of the mounting pressure from creditors, the distraction of the OMC Litigation, and the expressed desire of potential purchasers to acquire the assets free and clear of claims and interests.

**The Company's Strategy for the Case**

32. The Debtor is already in the process of discussing with several interested parties a potential going-concern sale of substantially all assets. The Debtor anticipates those discussions will intensify post-petition and will continue for approximately the next 30 days. At the end of such 30 day period, the Debtor believes it will either have a written agreement with a potential purchaser, or the Debtor will likely be forced convert its case to a chapter 7. If an agreement is reached with a potential purchaser within the next 30 days, the Debtor would anticipate filing a motion to approve bid procedures and a sale motion, and would seek to conduct a sale subject to overbid before mid-June 2016. The Debtor will not seek an extension of the time to file its schedules and statement of financial affairs (collectively, the "Schedules"), and will seek to file its sale motion (if any) subsequent to the filing of the Schedules.

33. There are three factors creating the timing pressure in this case. First, the Debtor's business is suffering. As a result of the recent challenges and uncertainty facing the company, the Debtor had to forego its sales pipeline in the lead-up to the petition date and it would take from 3-6 months to build that pipeline up to a break-even point. The revenue over the next 60 days only buys the company so much time before significant additional investment will be needed in order to preserve the business.

34. Second, the Debtor is operating with a truly bare bones team (myself and two employees). That sort of operation is not sustainable over much more than 60 days. The Debtor is already at risk of losing the remaining team members given the company's circumstances. If the Debtor is to capture the going concern value of its business, it will need to move quickly.

35. Third, the Debtor operates in a very distinct niche among a small circle of players. Word of the Debtor's bankruptcy filing will get out quickly and it is likely that

potential purchasers will decide whether to pursue an acquisition in short order.  The Debtor does not believe that extending the length of the marketing process will change the ultimate result.  If an acquirer is interested, the 60 day timeline will not be material.  The Debtor has begun the marketing process and is already communicating with a few interested parties.  It has prepared a form of an NDA for use in this process, and I will be attending one of the top industry eLearning conferences the week of April 18.  Also, as part of these efforts, the Debtor has engaged the services of Kyle Everett as Chief Restructuring Officer (CRO) to lead the Debtor through the sale process.

36. Although the Debtor has no secured creditors and is not seeking to borrow during the course of this case, it has prepared a 13-week cash budget in order to provide the Court and other parties in interest with an overview of the Debtor's financial situation.  To the extent it becomes clear that a sale transaction is not viable within the next 30 to 60 days, it is unlikely the Debtor would reach a full 13 weeks operating as a chapter 11 debtor in possession, and instead it is anticipated that the case would be converted to chapter 7.

## FIRST DAY MOTIONS

37. Concurrently with the filing of its chapter 11 petition, the Debtor has filed, for the Court's approval, two First Day Motions, which the Debtor believes are necessary to enable it to operate in chapter 11 with a minimum of disruption and loss of productivity.  The Debtor respectfully request that each of the First Day Motions be granted, as they are a critical element in stabilizing and facilitating the Debtor's operations at this critical stage of the Bankruptcy Case.  A description of the relief requested and the facts supporting each of the First Day Motions are set forth below.

**Motion to Limit Service of Notice**

38. As of the Petition Date, the Debtor had numerous parties to be served in this case. Between venders, experts, contracts and clients, the Debtor estimates that such parties add up to over 1,000 parties.  Providing notice of all matters in the Bankruptcy Case to all such parties would be costly and time-consuming and would minimize recovery to creditors.

-10-

39. Also, because the Debtor's business largely involves interfacing with customers of the internet, contact information for many customers is limited to an email address only (as opposed to a physical address). The Debtor wants to ensure that it is reaching those customers in a manner consistent with its obligations under the Bankruptcy Code.

40. In view of the large number of creditors and interested parties in the Bankruptcy Case, the limitation of service of notice as set forth in the motion is especially appropriate in a case of this size and magnitude, where providing notice of every matter to all the creditors and potentially interested parties would likely substantially delay the provision of notice in each particular instance, place an unjustifiably heavy burden on the estate, impede the timely consummation of transactions or the granting of other relief that may be advantageous to the estate and its creditors.

41. The Debtor believes that the proposed limited notice still protects the parties' right to be heard. As set forth in the Motion, the Debtor will serve all known creditors and parties in interest in this Bankruptcy Case with copies of the order granting the motion, which will alert interested parties to file and serve requests for notice if they desire.

42. The Debtor has physical addresses for approximately 500 of the parties in interest and only email addresses for approximately 700 other parties who consist mostly of consumer clients. The Debtor proposes to serve the order granting the motion by US Mail the parties for whom it has physical addresses and by email to the parties for whom the Debtor only has email addresses. To the extent any party who is served the order by email requests to receive notice at a physical address, the Debtor will supplement the matrix in the case with the physical address provided by such party.

**Cash Management Motion**

43. The Debtor's Cash Management System.

(a) Bank Accounts:

44. The Debtor currently maintains the following three bank accounts with Bank of America:

-11-

| Account | Account Number | Description |
| --- | --- | --- |
| Operating Acct. | xxxxxxxx5207 | Primary checking account used for payment of operating and day-to-day expenses. |
| Deposit Acct. | xxxxxxx 2791 | Funds processed from online payment processer are deposited into this account. |
| Other Acct. | xxxxxxx 0946 | Used for receipt of ACH payments from a client. |

(b) Online Payment Processors:

45. In the normal course of business, the Debtor accepts payments over the internet for the services it provides. The Debtor is able to accept online payments through its established arrangement with the following providers of online payment systems: Stripe (stripe. com), PayPal (www.paypal.com) and Recurly (www.recurly.com) (collectively, "Online Payment Processors").

46. Stripe and PayPal offer a web-based platform that operates an online payment system. Through Stripe and PayPal, the Debtor is able to collect payments online from customers using credit cards. Recurly provides enterprise-class subscription management for web-based businesses. Many of the Debtor's arrangements with its clients are based on subscriptions, which necessitate the services of a subscription management provider. Recurly's services are integrated with Stripe. Recurly manages the customer data and customer subscriptions and Stripe processes the payments from customers. Gusto offers payroll processing services. The Debtor uses this service to processes its payroll via ACH payment which includes tax withholding payments. Gusto is also the Debtor's broker of record for health insurance coverage. The cost of this service to the Debtor is $40 per month. To the extent any amounts are due to Gusto for the pre-petition period, the Debtor believes such amounts are *de minimis*, consisting of the prorated amount of the monthly fee for the period in April until the Petition Date.

47. The majority of the online payments are processed through Stripe, and a very limited number of recurring transactions are processed through PayPal. Under its

arrangement with Stripe, the Debtor is able to accept credit card payments on its web properties consisting of popexpert.com, onlinemarketinginstitute.co and mindfulinstitute.co.

48. The funds processed are not available to the Debtor immediately but held briefly as a "pending balance" in the Debtor's online interface established with Stripe and then ultimately released as "available." The Debtor then transfers these "available" funds to its Deposit Account at Bank of America.

49. As of the Petition Date, online payment transactions were in various stages of being processed and it is likely that certain processing fees and chargebacks had accrued prepetition, but had not yet been netted out against the amounts owed to the Debtor and remain unpaid. To the extent any such amounts are owing, the Debtor believes such amounts do not exceed $250 and are immaterial.

50. The merchant processing fees for processing an online payment transaction consist of a percentage of the amount processed (2.9%) plus a certain amount per transaction ($0.30). The Debtor does not believe any amounts are owing as of the Petition Date to its Online Payment Processors as the fee charged is debited as part of the transaction when it is processed.

51. Recurly charges a monthly fee of $99 for its services, in addition to 1.25% of the transaction amount, plus $0.10 per transaction. These charges are paid monthly in arrears through the company's credit card.

(c) <u>The Proposed Post-Petition Cash Management System</u>.

52. The Debtor proposes to maintain the cash management system with respect to its bank accounts as described above with the following changes. First, the signature cards on all of the Debtor's accounts will be changed to reflect the Debtor's "debtor-in-possession" status. Second, the Debtor will work with its banks to ensure that no pre-petition checks or other pre-petition claims are honored. The cash management system with respect to the bank accounts, with these changes, would remain in place subject to further order of this Court.

-13-

53. Subject to a prohibition against honoring prepetition checks or offsets without specific authorization from this Court, the Debtor requests that it be authorized to maintain and continue the use of these accounts in the same manner and with the same account numbers, styles and document forms as those employed during the prepetition period.

54. In addition, the Debtor requests Court approval to continue to honor its arrangements with its Online Payment Processors. Having specific authority to continue doing business with these parties will be critical to the continued business and operations of the Debtor.

55. As part of the relief requested, the Debtor also seeks a waiver of the requirement by the United States Trustee to establish specific bank accounts for tax payments. The Debtor believes that tax obligations can be paid most efficiently pursuant to its existing cash management system, that the U.S. Trustee can adequately monitor the flow of funds into, among, and out of the bank accounts through the Debtor's required monthly operating reports, and that the creation of new debtor in possession accounts designated solely for tax obligations would be unnecessary and inefficient.

(d) <u>Benefits of the Cash Management System</u>.

56. The existing cash management system is efficient and effective. The Debtor believes that it will be disruptive to the Debtor's ongoing business operations to shut the existing system down. Such a disruption would require the Debtor to dedicate its scarce human resources to opening new bank accounts and reestablishing relationships with third party service provides– all with no corresponding benefit to creditors. A drastic shift in the cash management system would likely confuse customers and disrupt the flow of revenue. Some customers, rather than making new payment arrangements, might simply decide to end their subscription. The resulting drop in revenue could be devastating, especially to a business attempting to preserve going concern value as part of a sale.

57. The continuation of the Debtor's existing cash management system, subject to the protections described above with respect to the existing bank accounts, are more than adequate to protect creditors, the Debtor's estate and parties in interest.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 12, 2016, at San Francisco, California.

INGRID SANDERS

Case: 16-30390    Doc# 6    Filed: 04/12/16    Entered: 04/12/16 15:18:41    Page 16 of 18

**EXHIBIT A**

**Exhibit A**

**Budget**

| | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Beginning of Week | | | $11,112.02 | $13,862.02 | $20,612.02 | $9,319.02 | $17,845.02 | $20,595.02 | $32,845.02 | $17,595.02 | $17,845.02 | $14,371.02 | $19,121.02 | $23,871.02 | $8,621.02 | -$3,354.98 |
| | | | 4/12/2016 | 4/18/2016 | 4/25/2016 | 5/2/2016 | 5/9/2016 | 5/16/2016 | 5/23/2016 | 5/30/2016 | 6/6/2016 | 6/13/2016 | 6/20/2016 | 6/27/2016 | 7/4/2016 | 7/11/2016 |
| Cash Receipts | | | | | | | | | | | | | | | | |
| | Credit Card Revenue | | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 |
| | Expected AR | | | $2,000.00 | | $20,000.00 | | $7,500.00 | | $5,500.00 | | | | | | |
| | | | $5,000.00 | $7,000.00 | $5,000.00 | $25,000.00 | $5,000.00 | $12,500.00 | $5,000.00 | $10,500.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 |
| Total Available Cash | | | $16,112.02 | $20,862.02 | $25,612.02 | $34,319.02 | $22,845.02 | $33,095.02 | $37,845.02 | $28,095.02 | $22,845.02 | $19,371.02 | $24,121.02 | $28,871.02 | $13,621.02 | $1,645.02 |
| Cash Disbursements | | | | | | | | | | | | | | | | |
| | Payroll | | | | $16,043.00 | | | | $20,000.00 | | | | | $20,000.00 | | |
| | Contractors | $2,000.00 | | | | | | | | | | | | | | | |
| | Employee Expense Reports | | | | | | $2,000.00 | | | | $2,000.00 | | | | | | |
| | Travel & Entertainment | | | | | | | | | | | | | | | | |
| | Refunds | $250.00 | | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 |
| | Expert Payout | | | | | $500.00 | | | | | $500.00 | | | | $500.00 | | |
| | Software Costs | | | | | $4,000.00 | | | | | $4,000.00 | | | | $4,000.00 | | |
| | Workers Comp | | | | | | | | | | | | | | | | |
| | General Liability | | | | | | | | | | | | | | | | |
| | E&O | | | | | | | | | | | | | | | | |
| | Health Insurance | | | | | $1,500.00 | | | | | $1,500.00 | | | | $1,500.00 | | |
| | Dental Insurance | | | | | $224.00 | | | | | $224.00 | | | | -$224.00 | | |
| Bankruptcy Costs* | | | | | | | | | | | | | | | | |
| | CRO | | | | | $10,000.00 | | | $10,000.00 | | | | | | $10,000.00 | | |
| | Accountants | | | | | | | | | | | | | | | | |
| | UST Fees | | | | | | | | | | | | | | $950.00 | | |
| | Lawyers | | | | | | | | | | | | | | | | |
| Total Cash Disbursements | | | $2,250.00 | $250.00 | $16,293.00 | $16,474.00 | $2,250.00 | $250.00 | $20,250.00 | $10,250.00 | $8,474.00 | $250.00 | $250.00 | $20,250.00 | $16,976.00 | $250.00 |
| Weekly Change in Cash | | | $2,750.00 | $6,750.00 | -$11,293.00 | $8,526.00 | $2,750.00 | $12,250.00 | -$15,250.00 | $250.00 | -$3,474.00 | $4,750.00 | $4,750.00 | -$15,250.00 | -$11,976.00 | $4,750.00 |
| Ending Cash | | | $13,862.02 | $20,612.02 | $9,319.02 | $17,845.02 | $20,595.02 | $32,845.02 | $17,595.02 | $17,845.02 | $14,371.02 | $19,121.02 | $23,871.02 | $8,621.02 | -$3,354.98 | $1,395.02 |

Notes:

* It is anticipated that bankruptcy professionals will be paid from the proceeds of the sale of substantially all of the Debtor's assets, and since the extent of such proceeds are currently unknown, no amounts are shown on account of bankruptcy professionals.

** Disbursements for E&O, General, Workers Comp insurance are not reflected in Budget. To the extent there are any such amounts, they are minimal.

*** No disbursements for employee and travel expenses are reflected as those amounts are currently unknown.