SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
    A Limited Liability Partnership
    Including Professional Corporations
ORI KATZ, Cal. Bar No. 209561
ROBERT K. SAHYAN, Cal. Bar No. 253763
MATT R. KLINGER, Cal. Bar No. 307362
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
Telephone:     415.434.9100
Facsimile:     415.434.3947
Email:     okatz@sheppardmullin.com
           rsahyan@sheppardmullin.com
           mklinger@sheppardmullin.com

Counsel for Debtor Old PXPRT, Inc.,
f/k/a PopExpert, Inc.

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re | Case No. 16-30390 |
| | |
| | Chapter 11 |
| Old PXPRT, Inc., f/k/a PopExpert, Inc., | **MOTION FOR ORDER APPROVING GLOBAL SETTLEMENT OF DISPUTES** |
| Debtor. | |
| | Date:   December 1, 2016 |
| | Time:  10:00 a.m. |
| | Place:  United States Bankruptcy Court |
| | 450 Golden Gate Avenue |
| | Courtroom 19 |
| | San Francisco, CA 94111 |
| | Judge: Honorable Hannah L. Blumenstiel |

SMRH:479516605.6                                                MOTION FOR ORDER APPROVING SETTLEMENT

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT .................................................................. 1

II. FACTUAL BACKGROUND.................................................................... 2

    A.    The Debtor................................................................................. 2

    B.    The Disputes With Kahlow And OMC ................................... 3

    C.    The Bankruptcy Filing ............................................................ 4

    D.    Committee ................................................................................. 4

    E.    Sale of Assets ........................................................................... 4

    F.    Proofs of Claim ........................................................................ 4

III. THE SETTLEMENT ............................................................................... 5

IV. APPROVAL OF COMPROMISE ............................................................ 6

    A.    The Bankruptcy Code Encourages Compromise and Settlement. ........................... 6

    B.    The *A & C Properties* Factors Weigh in Favor of Approving the Settlement. ......... 8

        1.    The Probability of Success in the Litigation. ................................................. 8

        2.    Difficulties to Be Encountered in the Matter of Collection. ........................ 9

        3.    Complexity and Expense of the Litigation Involved.................................. 10

        4.    The Paramount Interest of the Creditors and Their Views......................... 10

    B.    The Settlement of the State Court Action against OMC and Kahlow Satisfies §363(b) if it Is Considered a "Sale"........................................................ 11

        1.    The Resolution of the Debtor's State Court Action against Kahlow and OMC Under the Settlement Is a Sound Exercise of the Debtor's Business Judgment, on Adequate Notice, and at Fair and Reasonable Price................. 12

        2.    Relief From the Fourteen Day Waiting Periods Under Bankruptcy Rules 6004(h) Is Appropriate. ...................................................................... 13

IV. CONCLUSION......................................................................................... 14

Old PXPRT, Inc. f/k/a PopExpert, Inc. (the "Debtor") moves this Court, pursuant to Federal Rule of Bankruptcy Procedure 9019, for an order approving a resolution (the "Settlement") of disputes among the following parties (collectively the "Parties"):

(1)     the Debtor;

(2)     OMC, a California corporation ("OMC");

(3)     Aaron Kahlow ("Kahlow"); and

(4)     Ingrid Sanders ("Sanders").

The terms of the Settlement are set forth in the Global Settlement Agreement (the "Settlement Agreement"), a copy of which is attached as ***Exhibit A*** to this motion (the "Motion").

This Motion is based on the discussion below, the concurrently-filed declaration of Ingrid Sanders (the ("Sanders Declaration"), all other relevant papers of record in the case, and any evidence or argument that may be presented to the Court in connection with its consideration of the Motion.

**I.**

**PRELIMINARY STATEMENT**

The Settlement Agreement documents the resolution of disputes between the Debtor and Sanders, on the one hand, and Kahlow and OMC, on the other hand. The disputes arose out of the prepetition transaction with OMC and Kahlow whereby the Debtor acquired assets of OMC and Kahlow served as the former CEO of the Debtor. The disputes became the subject of a state court proceeding pending in the superior court for the city and county of San Francisco (the "State Court Action") that commenced in December 2015. In the State Court Action, the Debtor asserted claims against Kahlow and OMC for alleged breach of fiduciary duty, breach of contract, fraud, and interference with prospective economic interest (the "Complaint") and Kahlow and OMC filed a cross-complaint, naming the Debtor and Sanders as co-defendants and asserting claims for breach of contract, rescission, false promise, and labor code violations (the "Cross-Complaint"). Thereafter, the Debtor filed this bankruptcy case and the State Court Action was stayed. Kahlow and OMC each filed a proof of claim in the case in the amounts of $42,332.61 and $4,129,807.73, respectively. Sanders also filed a proof of claim, which included an indemnity claim in an

unspecified amount.  The proposed resolution of these disputes represents much more than simply the compromise of disputes involving the Debtor and three of its creditors.  Rather, it represents the resolution of a substantial portion of the total claims in the case as well as disagreements that largely prompted this chapter 11 case.

Specifically, the Settlement Agreement provides for the following:

1.      Allowance of the claims filed by Kahlow and OMC;

2.      Satisfaction of the indemnity claim filed by Sanders;

3.      Dismissal, with prejudice, of the State Court Action; and

4.      The parties are to exchange mutual releases as described in the Settlement Agreement.

The Debtor anticipates the resolution of these disputes will save the estate a substantial amount in professional fees and litigation costs for the benefit of the creditors and likely facilitate a speedier distribution to creditors on account of their claims.  Furthermore, the settlement will resolve certain significant proofs of claim in this case, representing nearly 44% of the total identified claim amounts.  Finally, the Settlement will clear the path for the Debtor to seek the dismissal of this case in conjunction with a distribution to its creditors.

As described further below, the Settlement is reasonable, it is in the best interests of the estates and the Court should approve it.

## II.

## FACTUAL BACKGROUND

### A.      The Debtor

Prior to its sale of assets, the Debtor was engaged in the development and operations of a number of internet platforms that provide on demand access to lifelong learning.  Its platforms enabled customers to learn from top experts around topics that help customers improve at life, work and play.  The company, was founded in 2012 and was based in San Francisco, California.  It funded its initial operations largely through funding from investors in exchange for promissory notes.  Sanders was the Debtor's founding CEO.

**B.      The Disputes With Kahlow And OMC**

In August 2014, Sanders expressed a desire to step out of the CEO role and the company began searching for a new CEO.  As the CEO search was underway, Sanders reconnected with Kahlow, then the head of OMC, who expressed an interest in an opportunity to lead a company with bigger market potential.  He also expressed an interest in selling an asset developed under OMC, the Online Marketing Institute ("OMI"), which provides on-demand elearning programs to small business and start-ups, agencies and consultants, consumer brands, and others.

After negotiations between the parties, the Debtor and OMC entered into a sale and purchase agreement in which the Debtor would acquire certain assets of OMC, including the OMI portion of OMC's business.  The acquisition closed at the end of 2014 (the "OMC Transaction").  As consideration for the transaction, the Debtor issued two promissory notes (together, the "OMC Notes") in favor of OMC.  The first was a cash note in the face amount of $400,000.  The second was a convertible note in the face amount of $3.6 million.

Additionally, in connection with the OMC Transaction, Kahlow was hired as the Debtor's new CEO in November 2014, approximately two months prior to the official close of the transaction following a verbal agreement between the parties to the acquisition terms.   He also became a member of the Debtor's board of directors.

In August 2015, Kahlow agreed to resign after negotiating a separation agreement with the company.  Upon the resignation of Kahlow, Sanders re-assumed the role of CEO.

In December 2015, the Debtor filed the Complaint against Kahlow and OMC.  In the Complaint, the Debtor alleged several causes of actions, including for breach of fiduciary duties, breach of contract and misrepresentations, and sought damages and declaratory relief against Kahlow and OMC.  The Debtor asserted that it had suffered several significant setbacks as a result of the OMC Transaction and management decisions made during Kahlow's term.  The Debtor alleged that the setbacks were related to, among other things, undisclosed accounts payable liabilities, overestimated projected revenue, dissatisfaction of key clients and experts, and reduced content quality.  The Debtor also alleged that it missed two distinct opportunities to secure capital from new investors and lenders due to concerns regarding these issues.

In response to the Complaint, OMC and Kahlow filed their Cross-Complaint against the Debtor and Sanders, alleging, among other claims, claims for breach of contract, false promise, and labor code violations. In the Cross-Complaint, Kahlow and OMC sought damages as well as declaratory and injunctive relief. The Complaint and the Cross-Complaint constitute the only pending litigation involving the Debtor.

**C.      The Bankruptcy Filing**

The Debtor commenced this bankruptcy case by filing a voluntary chapter 11 petition on April 12, 2016, commencing Case No. 16-30390 in the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Case"). As stated in the Debtor's "first day" filings, the Debtor initiated the Bankruptcy Case, in part, because of the distraction from the litigation with Kahlow and OMC and because of the expressed desire of potential purchasers of the Debtor to acquire its assets free and clear of claims and interests. As also stated in the Debtor's "first day" filings, the Debtor's strategy in the Bankruptcy Case was to conduct a sale of its assets in an expedited manner.

**D.      Committee**

On May 5, 2016, the United States Trustee filed a notice of appointment of the Official Committee of Unsecured Creditors (the "Committee") in the Bankruptcy Case. [Dkt. No. 41].

**E.      Sale of Assets**

On May 16, 2016, the Debtor filed a motion for the sale of substantial all of its assets to a stalking horse bidder and subject to an auction (the "Sale Motion"). The Debtor held an auction on June 2, 2016, at which auction the Debtor's assets were sold for $534,000. The sale closed on June 8, 2016. After payment of administrative expenses, the funds remaining from the sale are approximately $200,000.

**F.      Proofs of Claim**

The following are the relevant Proofs of Claim which are addressed by the Settlement Agreement:

(i) OMC has filed Proof of Claim No. 8 on the Claims Register asserting a general unsecured claim against the Debtor in the amount of $4,129,807.73 on the basis of the face value

of the OMC notes, plus interest. The Debtor had scheduled OMC's claim on the basis of the OMC Notes as disputed, contingent, or unliquidated;

(ii) Kahlow has filed Proof of Claim No. 9 on the Claims Register asserting a general unsecured claim against the Debtor in the amount of $42,332.61 on the basis of business expenses entitled to reimbursement under California state law; and

(iii) Sanders has filed Proof Of Claim No. 26 on the Claims Register, asserting claims for: (a) $142,034.57 for unpaid salary and wages and unreimbursed expenses (the "<u>Wage Claim</u>"), of which $12,850.00 is asserted as a priority claim under 11 U.S.C. §507(a)(4) and the balance as a general unsecured claim, scheduled by the Debtor in the amount of $12,475.00 and $89,212.00, respectively, and (b) a claim for indemnity in an unknown amount under applicable law and/or corporate documents of the Debtor (the "<u>Indemnity Claim</u>").

The remaining claims against the estate (scheduled and filed) other than the claims addressed in the Settlement are approximately $5.2 million.

## III.

## <u>THE SETTLEMENT</u>

After the closing of sale of the Debtor's assets, the Parties met and conferred to discuss the resolutions of: (a) Sanders's, Kahlow's and OMC's respective claims against the estate; (b) the Complaint; and (c) the Cross-Complaint. The Debtor's counsel and counsel for Kahlow took the lead in those discussions. As part of those discussions, the Parties explored a possible resolution of their respective claims, the Complaint, and the Cross-Complaint in a manner that would bring certainty and finality to the parties and permit the estate to make distributions to creditors, rather than exhausting the limited funds of the estate through continued litigation. Following negotiations, the parties reached agreement on the terms of the Settlement. The Debtor is informed and believes that the Committee supports the Settlement.

The discussion below is meant only as a summary of some of the key points of the Settlement Agreement. A copy of the complete Settlement Agreement is attached to this Motion. The agreement itself was negotiated at length by and among the Parties and their counsel over a period of time. To the extent the summary in this Motion is inconsistent with the Settlement

Agreement, the Settlement Agreement controls.

Under the Settlement Agreement, the following will take place upon, or shortly after, the effectiveness of the Settlement:

(a) Upon the effective date of the Settlement, Kahlow and OMC's claims against the Debtor shall be allowed as general unsecured claims in their asserted amount, $42,332.61 and $4,129,807.73, respectively;

(b) Upon the effective date of the Settlement, Sanders shall agree that her Indemnity Claim shall be fully and finally satisfied;

(c) Upon the effective date of the Settlement, the mutual releases set forth in the Settlement Agreement will become effective; and

(d) Within five (5) business days of the effectiveness of the Settlement, the State Court Action, including the Complaint and Kahlow and OMC's Cross-Complaint, will be dismissed with prejudice and the Parties will cooperate in obtaining such dismissal.

## IV.

## APPROVAL OF COMPROMISE

### A. The Bankruptcy Code Encourages Compromise and Settlement.

The authority granted a trustee or debtor in possession to compromise a controversy is set forth in Rule 9019(a) of the Bankruptcy Rules, which provides in pertinent part:

> On motion by the trustee and after notice and a hearing, a court may approve a compromise or settlement.

Fed. R. Bankr. P. 9019(a).

In passing on proposed settlements, the standard that courts applied under the former Bankruptcy Act is also applicable under the Bankruptcy Code. As stated by the Supreme Court in *Protective Committee of Indep. Stockholders for TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 425 (1968), to approve a proposed settlement, a court must have found that the settlement was "fair and equitable" based on an "educated estimate of the complexity, expense, and likely duration of . . . litigation, the possible difficulties of collecting on any judgment which might be

obtained and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise."

The Ninth Circuit has established the following factors to be considered in determining whether to approve a settlement:

> [I]n determining the fairness, reasonableness and adequacy of a proposed settlement agreement, the Court must consider (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377, 1381 (9th Cir), *cert. denied sub nom. Martin v. Robinson*, 479 U.S. 854 (1986), overruled in part on other grounds, *In re Washington Public Power Supply System Sec. Litigation*, 823 F.2d 1349, 1350 (9th Cir. 1987).

In deciding whether to approve a settlement a court should not substitute its own judgment for the judgment of a trustee or a debtor. *See, Matter of Carla Leather, Inc*., 44 B.R. 457, 465 (Bankr. S.D.N.Y. 1984). In approving a settlement, the Court need not conduct an exhaustive investigation of the claims sought to be compromised. *See, e.g.*, *United States v. Alaska Nat'l Bank of the North (In re Walsh Constr., Inc.)*, 669 F.2d 1325, 1328 (9th Cir. 1982). Rather, it is sufficient that the Court find that the settlement was negotiated in good faith and is reasonable, fair, and equitable. *See, e.g.*, *A & C Properties*, 784 F.2d at 1381; *In re Churchfield*, 277 B.R. 769, 774 (Bankr. E.D. Cal. 2002). Accordingly, a settlement need only "be in the best interests of the estate and 'reasonable, given the particular circumstances of the case.'" *Goodwin v. Mickey Thompson Ent. Group, Inc. (In re Mickey Thompson Ent. Group, Inc.)*, 292 B.R. 415, 420 (9th Cir. BAP 2003). As a result, the Court is not required to decide the numerous questions of law and facts raised by the litigation. A "mini-trial" on the merits of the underlying cause of action is not required. *See In re Blair*, 538 F.2d 849, 851-52 (9th Cir. 1976); *In re Walsh Construction, Inc.*, 669 F.2d 1325, 1328 (9th Cir. 1982); *In re Schmitt*, 215 B.R. 417, 423 (B.A.P. 9th Cir. 1997). Instead, the Court's responsibility is only to "canvass the issues to see whether the settlement 'falls

below the lower point in the range of reasonableness.'" *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983).

In addition, a transaction amounting to a sale of causes of action to a defendant must be analyzed as a compromise as to which the Court has an independent duty to determine whether it is "fair and equitable." *In re Lahijani*, 325 B.R. 282, 290 (B.A.P. 9th Cir. 2005).

**B.      The *A & C Properties* Factors Weigh in Favor of Approving the Settlement.**

The four factors identified in *A & C Properties* support approval of the Settlement. The Settlement—which has been negotiated in good faith at arm's length among the parties—is reasonable, fair, equitable and in the best interest of the estate.

1.      The Probability of Success in the Litigation.

This factor is in favor of the Settlement. Because the Settlement addresses several claims, many of which are interrelated, the analysis of this factor with respect to any one of these disputes by itself should not be determinative. Rather, the analysis of this factor should be undertaken with respect to all the claims resolved under the Settlement as a whole. Undertaken as such, the analysis of this factor leads to the conclusion that the Settlement is good for the Debtor and its creditors.

While the Debtor believes it would ultimately succeed in the litigation, there is uncertainty in any litigation and litigating the claims the Debtor asserted in its Complaint involves substantial uncertainty with respect to both facts and law. In its Complaint, the Debtor asserted several causes of action, including causes of action for breaches of fiduciary duties and contract, fraud, and interference with economic interest. These claims implicate difficult legal issues. They also involve a significant amount of facts. For instance, the Debtor has asserted in the Complaint that management actions placed the Debtor in a precarious financial and operational condition and prevented the Debtor from extracting itself from this condition by causing it to miss opportunities to secure capital from new investors and lenders. Further, the Debtor has asserted that certain funds that were supposed to be received by the Debtor pursuant to the OMC Transaction never materialized. These issues and other issues require are required to be demonstrated to the trier of facts under applicable standards of proof. The Debtor believes that these allegations support its

1  position in the litigation and that, if the litigation were to continue and if these allegations were

2  proven, the Debtor would be successful in obtaining a judgment in its favor.

3      For their part, Kahlow and OMC has disputed the Debtor's assertions and asserted

4  counterclaims in their Cross-Complaint. They alleged lack of intent to pay the OMC Notes when

5  they were issued and that failure to reimburse Kahlow for various reimbursable expenses. The

6  Debtor has vehemently disputed the allegations made against it in the Cross-Complaint and feels

7  confident that, if it were to litigate these issues, it would ultimately succeed.

8      However, after an initial investigation, the Debtor has concluded that, while the probability

9  of success in these matters is fairly good, the cost savings associated with the Settlement counsel

10  in favor of settlement. The remaining estate assets consist of the $200,000 balance from the sale

11  of the Debtor's assets, and costs of litigation through conclusion would likely exhaust all such

12  funds.

13      Also, OMC and Kahlow have expressed confidence in their positions and asserted

14  counterclaims. And, because the Debtor's analysis has been conducted prior to the conclusion of

15  discovery in the State Court Action, there could be certain facts or circumstances that could

16  change this analysis and the Debtor's view of the case.

17      Moreover, even if the Debtor were to prevail in its Complaint, the Debtor would still face

18  the risk of an adverse determination with respect to the claims raised in the Cross-Complaint. The

19  Debtor recognizes it could find itself in a situation where any positive outcome it would achieve

20  on account of the Complaint would be effectively negated, or worse, by a judgment against it on

21  account of the Cross-Complaint.

22      In light of the high cost and uncertain outcome of litigating these disputes, the Settlement

23  represents a reasonable and fair resolution of the disputes and the Court should approve it.

24      2.      Difficulties to Be Encountered in the Matter of Collection.

25      This factor supports approval of the Settlement. The difficulty in collection is normally

26  considered from the perspective of the estate. With respect to the claims of Kahlow and OMC,

27  collection is not being sought by the estate but against it. With respect to the Debtor's claims in

28  the Complaint, the difficulty in collection would arise from the ability to collect from an

individual and a small company, none of which is believed to be a "deep pocket" defendant. The Debtor is not confident that, if it prevailed in the litigation, it could collect significant amounts from the defendants.

   3.   Complexity and Expense of the Litigation Involved.

This factor also supports approving the Settlement. The Settlement permits all parties to avoid what is likely to be costly litigation involving multiple causes of action, each with underlying issues of fact and law that have to be addressed. For example, the Debtor's Complaint raises various factual and legal issues related to contract interpretation, the parties' intent when negotiating the OMC Transaction, the Debtor's financial condition before and after the OMC Transaction, the specific actions taken by management during Kahlow's tenure and the impact of those actions. The resolutions of these issues almost certainly would involve several parties and witnesses, extensive discovery, substantial briefing, complex arguments, and evidentiary hearings. This translates into significant costs that the estate would have to incur to see the litigation through. Significant time, effort and resources would be required for further investigation and discovery, the preparation of witnesses, trial motions and other documents, and a full trial on the merits. In addition, regardless of the outcome of the litigation on the trial level, it is reasonable to expect that the party that suffers an adverse judgment would appeal any such judgment. Such appeal would raise additional difficult and complicated issues of law, necessitating lengthy briefing and further delay, with considerable attorneys' fees and expenses being incurred as a result. The Debtor does not have a large war chest and only has the remaining funds from the sale that would likely be fully expended before the litigation and any appeal are concluded. When coupled with the uncertainty of collection, the determination to settle and save the costs of litigation is reasonable.

As such, this factor strongly supports approving the Settlement.

   4.   The Paramount Interest of the Creditors and Their Views.

The interest of creditors weighs very heavily in favor of the Settlement. By avoiding the long and costly litigation regarding the Complaint and the Cross-Complaint (which represent all pending litigation involving the Debtor), the Settlement preserves the funds generated from the

Debtor's sale of its assets for the benefit of its creditors. The Settlement will facilitate a speedier distribution to creditors on account of their claims and prevent dissipation of the estate through prolonged, costly, and risky litigation.

In addition, the Settlement was negotiated by the Parties at arm's length, each represented by counsel, and is supported by the Committee. The claims involved in the Settlement represent approximately 44% of the pool of claims against the estate (excluding the Indemnity Claim, which is for an indefinite amount). Moreover, under to the Settlement the Debtor eliminates its obligation on account of the Indemnity Claim.

Thus, all of the Rule 9019 factors weigh in favor of approving the Settlement, as embodied in the Settlement Agreement.

**B.      The Settlement of the State Court Action against OMC and Kahlow Satisfies §363(b) if it Is Considered a "Sale".**

The Debtor does not believe it is necessary to analyze the resolution of the State Court Action against OMC and Kahlow under section 363 of the Bankruptcy Code because such resolution is part of a global settlement that involves interrelated disputes, including substantial claims against the Debtor. Nevertheless, the Debtor offers the following discussion to provide the "sale" analysis of the resolution of the Debtor's claims asserted in the State Court Action against Kahlow and OMC out of an abundance of caution.

Bankruptcy Code section 363(b) provides that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Such a sale will be approved if the trustee demonstrates that "such disposition has a valid business justification … [and] … is proposed in good faith." *In re 240 North Brand Partners, Ltd*., 200 B.R. 653, 659 (B.A.P. 9th Cir. 1996) (citing *In re Lionel Corp*., 722 F.2d 1063, 1070 (2nd Cir. 1983) and *In re Wilde Horse Enters., Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991)); *see also, In re Walter*, 83 B.R. 14, 19-20 (B.A.P. 9th Cir. 1988) (stating that a debtor must show "some articulated business justification for using . . . the property outside the ordinary course of business…. Whether the proffered justification is sufficient depends on the case."). Great deference is generally afforded to the business judgment of the debtor. *See*, *e.g.*, *Lebbos v.*

*Schuette*, No. 08-CV-00680, 2008 WL 5103200, at *5 (E.D. Cal. Dec. 2, 2008) (affirming bankruptcy court's approval of the sale of a cause of action by the trustee over the objection of the debtor); *see also*, *In re Lahijani*, 325 B.R. 282 (9th Cir. BAP 2005).

Several courts have held that the "sound business judgment" test requires a debtor to establish four elements in order to justify the use of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies such use, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable consideration, and (d) good faith. *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3rd Cir. 1986) (creating the "*Abbotts Dairies* Test"); *Lionel Corp*, 722 F.2d at 1071; *In re Idaho Photocopy & Supply, Inc.*, 1994 WL 553065 (Bankr. D. Idaho 1994).

    1.   <u>The Resolution of the Debtor's State Court Action against Kahlow and OMC Under the Settlement Is a Sound Exercise of the Debtor's Business Judgment, on Adequate Notice, and at Fair and Reasonable Price.</u>

The decision to proceed with the resolution of the Debtor's State Court Action as contemplated under the Settlement is based upon the Debtor's sound business judgment, which satisfies the first prong of the *Abbotts Dairies* Test. A trustee's showing of a sound business purpose need not be unduly exhaustive but, rather, a trustee is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel*, 722 F.2d at 1071.

Here, the resolution of the claims is being undertaken pursuant to an arm's length transaction and as part of a global resolution which will provide the estate with significant benefits. As indicated above, although the Debtor believes it would ultimately succeed in litigation, there are inherent risks associated with such litigation and any success will come only after expending significant amounts for attorneys' fees and other costs associated with litigation. There is also a risk of an adverse determination with respect to the causes of action asserted in the Cross-Complaint. On the other hand, the resolution of the claims pursuant to the Settlement will save the estate a substantial amount in professional fees and litigation costs. Furthermore, the

settlement will clear the path for the Debtor to seek the dismissal of this bankruptcy case, likely facilitating a speedier distribution to creditors on account of their claims.

In addition, interested parties are being afforded reasonable and adequate notice in satisfaction of the second prong of the *Abbotts Dairies* Test. The service of the notice of this Motion provides adequate notice of the relief contemplated here. Accordingly, the reasonable and adequate notice requirement is satisfied.

Pursuant to this Court's *Final Order Approving Debtor's Emergency Motion for Order Limiting Service of Notice of Certain Matters* [Dkt. No. 36], notice of the Motion and will be provided to the following parties, each of which will have an opportunity to be heard: (i) the Office of the United States Trustee; (ii) counsel for the Official Committee of Unsecured Creditors; (iii) counsel for parties involved in pending litigation with the Debtor; (iv) counsel for any party directly affected by this motion; (v) parties that have filed and served on counsel for the Debtor requests for special notice; (vi) parties that have sent a request to the Debtor's counsel to be added to the service list (of which there are none); and (vii) other parties that the Court may direct. Such notice is adequate for entry of the order on the Motion and satisfies the requisite applicable requirements under section 363(b) of the Bankruptcy Code.

2. <u>Relief From the Fourteen Day Waiting Periods Under Bankruptcy Rules 6004(h) Is Appropriate.</u>

Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." The Debtor requests that the order approving the Motion be effective immediately, by providing that the fourteen (14) day stay under Bankruptcy Rules 6004(h) is waived. The ability to make distribution in the 2016 year, including on account of claims subject to the Settlement, will help the Debtor minimize the expenses of the tax implications that may result from having to make the distributions in 2017. As such, waiving the 14-day period would facilitated making sooner and save the estate additional expenses.

**IV.**

**CONCLUSION**

For the reasons and based on the authorities set forth above, the Debtor respectfully requests that the Court enter an order, approving the Settlement, authorizing the Debtor to enter into the Settlement Agreement and granting such other and further relief that may be appropriate.

Dated: November 3, 2016

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By             */s/ Ori Katz*

ORI KATZ
ROBERT K. SAHYAN
MATT R. KLINGER

Counsel for Debtor Old PXPRT Inc., f/k/a
PopExpert, Inc.

# EXHIBIT A

# GLOBAL SETTLEMENT AGREEMENT

This Global Settlement Agreement ("Agreement") is entered into as of November 3, 2016 by and among Old PXPRT, Inc., a Delaware corporation f/k/a PopExpert, Inc. (the "Debtor"), Ingrid Sanders, an individual ( "Sanders"), OMC, a California corporation ("OMC"), and Aaron Kahlow, an individual ("Kahlow"). The Debtor, Sanders, OMC, and Kahlow are occasionally referenced hereinafter as the "Parties" and individually as a "Party."

## RECITALS

A.     On December 14, 2015, the Debtor commenced a lawsuit ("State Court Action") against Kahlow and OMC in the superior court for the city and county of San Francisco ("State Court"), Case No. 15-549394, seeking damages and declaratory relief and asserting various causes of action, including breach of fiduciary duty, breach of contract, fraud, and interference with prospective economic interest (the "Complaint").

B.     Kahlow and OMC filed in the State Court Action a cross-complaint, naming the Debtor and Sanders as co-defendants and asserting causes of action, including breach of contract, rescission, false promise, and labor code violations (the "Cross-Complaint").

C.     As of the date of this Agreement, the State Court Action remains pending before the superior court.

D.     On April 12, 2016, the Debtor commenced a Chapter 11 bankruptcy case in the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court"), Case No. 16-30390 (the "Bankruptcy Case"). The Bankruptcy Case remains pending before the Bankruptcy Court.

E.     Within the Bankruptcy Case, OMC has asserted a general unsecured claim against the Debtor in the amount of $4,129,807.73, filed as a Proof of Claim No. 8 on the Claims Register in the Bankruptcy Case and scheduled by the Debtor as disputed, contingent, or unliquidated (the "OMC Claim")

F.     Within the Bankruptcy Case, Kahlow has asserted a general unsecured claim against the Debtor in the amount of $42,332.61, filed as a Proof of Claim No. 9 on the Claims Register in the Bankruptcy Case (the "Kahlow Claim").

G.     Within the Bankruptcy Case, Sanders has asserted a claim against the Debtor, filed as Proof Of Claim No. 26, asserting the following: (i) $142,034.57 for unpaid salary and wages and unreimbursed expenses (the "Wage Claim"), of which $12,850.00 is asserted as a priority claim under 11 U.S.C. §507(a)(4) and the balance as a general unsecured claim, scheduled by the Debtor in the amount of $12,475.00 and $89,212.00, respectively, (ii) a claim for indemnity in an unknown amount under applicable law and/or corporate documents of the Debtor (the "Indemnity Claim").

H.     On June 2, 2016, the Court entered its order approving the sale of substantially all of the Debtor's assets under section 363 of the Bankruptcy Code. The sale closed on June 8, 2016, generating certain funds for the estate.

Case: 16-30390    Doc# 102    Filed: 11/03/16    Entered: 11/03/16 17:00:31    Page 18 of 23

I.  The Debtor intends to file a motion to dismiss the Bankruptcy Case (the "Motion to Dismiss") and, in connection with the Motion to Dismiss, make distributions, net of administrative expenses, to creditors (the "Distributions").

J.  The Parties now desire to enter into this Agreement to resolve the disputes between them, and facilitate the Distributions upon the terms and conditions set forth below.

## 1.  SETTLEMENT AND COMPROMISE

1.1  Subject to and expressly conditioned upon the entry by the Bankruptcy Court of the Settlement Order approving this Agreement, this Agreement settles and resolves all disputes among the Parties.

1.2  This Agreement shall be subject to approval of the Bankruptcy Court and shall be effective on the first business day (the "Effective Date") the order approving this Agreement becomes a final order ("Approval Order").  For purposes hereof, the Approval Order shall become "final" upon the expiration of fourteen (14) days after entry of the Bankruptcy Court order approving this Agreement and no appeal or a motion under Federal Rule of Bankruptcy Procedure 8002(b) is then pending with respect thereto, or, if such an appeal or motion has been filed, it has been withdrawn, denied or dismissed and any further period in which to file an appeal or such a motion has expired.

## 2.  SETTLEMENT TERMS

2.1  As of the Effective Date, the Kahlow Claim and the OMC Claim shall be allowed as general unsecured claims in the amount of $42,332.61 and $4,129,807.73, respectively. Kahlow and OMC shall agree to receive, in full and final satisfaction of the Kahlow Claim and the OMC Claim, respectively, a payment in the amount equal to the pro rata share of such claim from the Distributions made to the creditors of the Debtor (such payments collectively being referred to herein as the "Kahlow/OMC Payment").  The Kahlow/OMC Payment shall be made at the time of making Distributions to creditors (the "Payment Date").

2.2  As of the Effective Date, Sanders shall agree that the Indemnity Claim shall be fully and finally satisfied.  Sanders will still retain her Wage Claim in the Bankruptcy Case and such claim shall be allowed in the amount and priority asserted in her filed Proof of Claim.

2.3  Commencing on the Effective Date, the Debtor, Sanders, Kahlow, and OMC shall use their best efforts to obtain, or cooperate in obtaining the dismissal of the State Court Action. Within five (5) business days of the Effective Date, (i) the Debtor shall file in the State Court a dismissal with prejudice of the Complaint, and (ii) Kahlow and OMC shall file a dismissal with prejudice of the Cross-Complaint. The Debtor, Kahlow, and OMC shall bear their own fees and costs in the State Court Action.

## 3.  RELEASE

3.1  As of the Effective Date, the Debtor and Sanders on the one hand, and Kahlow and OMC on the other hand, forever release, discharge, waive and abandon any and all claims, whether direct or representative, rights, demands, suits, matters, liens, mortgages, security

interests, pledges, encumbrances, privileges, priorities, issues or causes of action, whether known or unknown, whether based on international, federal, state, or local statutory or common law, rule or regulation, by contract or in equity, and whether directly, representatively or in any other capacity, that each may have as of the date of the full execution of this Agreement against each other and the other's present and former successors, transferees, partners, principals, officers, directors, employees, agents, investors, and attorneys or the other's respective properties or assets (collectively, the "Released Claims"), provided, however, that the Released Claims shall not include any claims arising under, brought under or to enforce the terms of this Agreement.

3.2 The releases given in this Agreement are intended to shall operate as general releases. Each of the Parties has read and fully understands the provisions of California Civil Code section 1542 which reads:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM, OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Understanding the language of California Civil Code section 1542 and being fully apprised of the legal import of such statute, each of the Parties does expressly waive any and all rights and/or remedies provided by such statute should this statute be deemed to apply to the matters released herein. Each of the Parties expressly acknowledges that they may in the future discover facts in addition to or different from those they now know or believe to be true. Nevertheless, the Parties fully, finally, and forever release any and all Released Claims whether or not hidden or excluded, known or unknown, against each other, without regard to the subsequent discovery or existence of different or additional facts.

## 4. REPRESENTATIONS AND WARRANTIES

4.1 In entering into this Agreement, each Party represents and warrants that the Party signatory to this Agreement has full right, power and authority to enter into this Agreement and to perform such Party's obligations and duties under this Agreement, and that the performance of such obligations and duties does not and will not conflict with or result in a breach of any other agreement of such Party or any judgment, order, or decree by which such Party is bound.

4.2 In entering into this Agreement, each Party represents and warrants that such Party has had the opportunity to consult its attorneys, who are the attorneys of its own choice concerning the legal and tax consequences of this Agreement; that each Party has completely read this Agreement, including all of its terms, and has had an opportunity to consult with counsel regarding those terms; and that the terms of this Agreement are fully understood and voluntarily accepted by said Party.

4.3 In entering into this Agreement, each Party represents and warrants that such Party has not sold, assigned, conveyed, pledged, encumbered, or otherwise in any way transferred to any person or entity any interest in the rights, claims, or causes of action such Party is releasing in this Agreement.

Case: 16-30390     Doc# 102     Filed: 11/03/16     Entered: 11/03/16 17:00:31     Page 20 of 23

5.   **GOVERNING LAW; VENUE; JURISDICTION**

This Agreement shall be construed and interpreted in accordance with the laws of the State of California without regard to any conflicts of law principles that would result in application of laws of any other jurisdiction.  The Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement, and each Party expressly and irrevocably consents and submits to the exclusive jurisdiction and venue of the Bankruptcy Court in connection with any such legal proceeding.

6.   **REMEDIES**

The rights and remedies of the Parties will be cumulative (and not alternative).  If any legal action is brought to enforce this Agreement, the prevailing Party will be entitled to receive its attorneys' fees, court costs, and other collection expenses, in addition to any other relief it may receive.

7.   **MISCELLANEOUS**

All waivers must be in writing and signed by an authorized representative of the Party to be charged.  Any waiver or failure to enforce any provision of this Agreement on one occasion will not be deemed a waiver of any other provision or of such provision on any other occasion.  Any rule of construction to the effect that ambiguities are to be resolved against the drafting party will not be applied in the construction or interpretation of this Agreement.  As used in this Agreement, the words "include" and "including," and variations thereof, will not be deemed to be terms of limitation, but rather will be deemed to be followed by the words "without limitation.  This Agreement shall be binding upon the Parties, their successors, assigns, and/or transferees.

8.   **ADDITIONAL DOCUMENTS**

All parties agree to cooperate fully and execute any and all supplementary documents, if any, and to take all additional actions which may be necessary or appropriate to give full force and effect to the basic terms and intent of this Agreement.

9.   **COUNTERPARTS**

The Parties hereto agree that this Agreement may be executed by facsimile or email and in any number of counterparts, each of which shall be deemed an original all of which together shall constitute one and the same document.

SMRH:479471823.4

**IN WITNESS WHEREOF**, the Parties hereto have executed this agreement as of the date first stated above:

**THE DEBTOR**

By: *Ingrid Sanders*
_____
Ingrid Sanders, Chief Executive Officer

**INGRID SANDERS**

By: *Ingrid Sanders*
_____
Ingrid Sanders, an individual

**OMC**

By: _____
Aaron Kahlow, Majority Shareholder and
Authorized Signatory

**AARON KAHLOW**

By: _____
Aaron Kahlow, an individual

SMRH:479471823

Case: 16-30390    Doc# 102    Filed: 11/03/16    Entered: 11/03/16 17:00:31    Page 22 of 23

**IN WITNESS WHEREOF**, the Parties hereto have executed this agreement as of the date first stated above:

**THE DEBTOR**

By: _____
Ingrid Sanders, Chief Executive Officer

**INGRID SANDERS**

By: _____
Ingrid Sanders, an individual

**OMC**

By: _____
Aaron Kahlow, Majority Shareholder and
Authorized Signatory

**AARON KAHLOW**

By: _____
Aaron Kahlow, an individual