SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
ORI KATZ, Cal. Bar No. 209561
ROBERT K. SAHYAN, Cal. Bar No. 253763
MATT R. KLINGER, Cal. Bar No. 307362
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
Telephone:    415.434.9100
Facsimile:    415.434.3947
Email:        okatz@sheppardmullin.com
              rsahyan@sheppardmullin.com
              mklinger@sheppardmullin.com

Counsel for Debtor Old PXPRT, Inc.,
f/k/a PopExpert, Inc.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>Old PXPRT, Inc., f/k/a PopExpert, Inc.,<br><br>Debtor. | Case No. 16-30390<br><br>Chapter 11<br><br>**DECLARATION OF INGRID SANDERS IN SUPPORT OF MOTION FOR ORDER APPROVING GLOBAL SETTLEMENT OF DISPUTES**<br><br>Date: December 1, 2016<br>Time: 10:00 a.m.<br>Place: United States Bankruptcy Court<br>    450 Golden Gate Avenue<br>    Courtroom 19<br>    San Francisco, CA 94111<br>Judge: Honorable Hannah L. Blumenstiel |

I, Ingrid Sanders, declare:

1. I am the Chief Executive Officer ("CEO") of Old PXPRT, Inc. f/k/a PopExpert, Inc. (the "Debtor"). I make this declaration in that capacity. Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge and my review of the Debtor's books and records and discussion with the Debtor's counsel. If I were called to testify as a witness in this matter, I could and would competently testify to each of the fact set forth herein based upon such discussion, my personal knowledge, review of documents, or opinion.

2. I submit this declaration in support of the *Motion for Order Approving Global Settlement of Disputes* (the "Motion"), filed concurrently with this declaration by the Debtor. I give undefined capitalized terms the same meaning given them in the Motion.

3. The Motion seeks Court approval of a global resolution (the "Settlement") among the following parties: (1) the Debtor; (2) Aaron Kahlow, an individual ("Kahlow"); (3) OMC, a California corporation ("OMC"); and (4) me, an individual. The terms of the Settlement are set forth in the Global Settlement Agreement (the "Settlement Agreement"), a true and correct copy of which is attached to the Motion as Exhibit A.

**A.     The Debtor**

4. Prior to its sale of assets, the Debtor was engaged in the development and operations of a number of internet platforms that provide on demand access to lifelong learning. Its platforms enabled customers to learn from top experts around topics that help customers improve at life, work and play. The company, was founded in 2012 and was based in San Francisco, California. It funded its initial operations largely through funding from investors in exchange for promissory notes. I am the Debtor's founding CEO.

**B.     The Disputes With Kahlow And OMC**

5. In 2014, I expressed a desire to step out of the CEO role and the company began searching for a new CEO. As the CEO search was underway, I reconnected with Kahlow, then the head of OMC, who expressed an interest in an opportunity to lead a

SMRH:479520541.2                              1

company with bigger market potential. He also expressed an interest in selling an asset developed under OMC, the Online Marketing Institute ("OMI"), which provides on-demand elearning programs to small business and start-ups, agencies and consultants, consumer brands, and others.

6. After negotiations between the parties, the Debtor and OMC entered into a sale and purchase agreement in which the Debtor would acquire certain assets of OMC, including the OMI portion of OMC's business. The acquisition closed at the end of 2014 (the "OMC Transaction"). As consideration for the transaction, the Debtor issued two promissory notes (together, the "OMC Notes") in favor of OMC. The first was a cash note in the face amount of $400,000. The second was a convertible note in the face amount of $3.6 million.

7. Additionally, in connection with the OMC Transaction, Kahlow was hired as the Debtor's new CEO in November 2014, approximately two months prior to the official close of the transaction following a verbal agreement between the parties to the acquisition terms. He also became a member of the Debtor's board of directors.

8. In August 2015, Kahlow agreed to resign after negotiating a separation agreement with the company. Upon the resignation of Kahlow, I re-assumed the role of CEO.

9. In December 2015, the Debtor filed the Complaint against Kahlow and OMC. In the Complaint, the Debtor alleged several causes of actions, including for breach of fiduciary duties, breach of contract and misrepresentations, and sought damages and declaratory relief against Kahlow and OMC. The Debtor asserted that it had suffered several significant setbacks as a result of the OMC Transaction and management decisions made during Kahlow's term. The Debtor alleged that the setbacks were related to, among other things, undisclosed accounts payable liabilities, overestimated projected revenue, dissatisfaction of key clients and experts, and reduced content quality. The Debtor also alleged that it missed two distinct opportunities to secure capital from new investors and lenders due to concerns regarding these issues.

10. In response to the Complaint, OMC and Kahlow filed their Cross-Complaint against the Debtor and myself, alleging, among other claims, claims for breach of contract, false promise, and labor code violations. In the Cross-Complaint, Kahlow and OMC sought damages as well as declaratory and injunctive relief. The Complaint and the Cross-Complaint constitute the only pending litigation involving the Debtor.

**C.     The Bankruptcy Filing**

11. The Debtor commenced this bankruptcy case by filing a voluntary chapter 11 petition on April 12, 2016, commencing the Bankruptcy Case. As I stated in my declaration in support of the Debtor's "first day" filings, the Debtor initiated the Bankruptcy Case, in part, because of the distraction from the litigation with Kahlow and OMC and because of the expressed desire of potential purchasers of the Debtor to acquire its assets free and clear of claims and interests. As also stated there, the Debtor's strategy in the Bankruptcy Case was to conduct a sale of its assets in an expedited manner.

**D.     Sale of Assets**

12. On May 16, 2016, the Debtor filed the Sale Motion for the sale of substantial all of its assets to a stalking horse bidder and subject to an auction. The Debtor held an auction on June 2, 2016, at which auction the Debtor's assets were sold for $534,000. The sale closed on June 8, 2016. After payment of administrative expenses, the funds remaining from the sale are approximately $200,000.

**E.     Proofs of Claim**

13. The following are the relevant Proofs of Claim which are addressed by the Settlement Agreement:

    a.     Proof of Claim No. 8 by OMC, asserting a general unsecured claim against the Debtor in the amount of $4,129,807.73 on the basis of the face value of the OMC notes, plus interest. The Debtor scheduled OMC's claim on the basis of the OMC Notes as disputed, contingent, or unliquidated;

b. Proof of Claim No. 9 by Kahlow, asserting a general unsecured claim against the Debtor in the amount of $42,332.61 on the basis of business expenses entitled to reimbursement under California state law; and

c. Proof Of Claim No. 26 by me, asserting claims for: (a) $142,034.57 for unpaid salary and wages and unreimbursed expenses (the "<u>Wage Claim</u>"), of which $12,850.00 is asserted as a priority claim under 11 U.S.C. §507(a)(4) and the balance as a general unsecured claim, scheduled by the Debtor in the amount of $12,475.00 and $89,212.00, respectively, and (b) a claim for indemnity in an unknown amount under applicable law and/or corporate documents of the Debtor (the "<u>Indemnity Claim</u>").

14. The remaining claims against the estate (scheduled and filed) other than the claims addressed in the Settlement are approximately $5.2 million.

**F.** **The Settlement**

15. The parties recently engaged in good faith, arms' length discussions to resolve the disputes described above. These discussions led to the Settlement Agreement, which the Debtor is informed and believes is supported by the Committee.

16. Among other things, the following will take place under the Settlement on its effective date:

a. Kahlow's and OMC's claims against the Debtor will be allowed as general unsecured claims in their asserted amounts of $42,332.61 and $4,129,807.73, respectively;

b. My Indemnity Claim shall be fully and finally satisfied;

c. The mutual releases set forth in the Settlement Agreement will become effective; and

d. The State Court Action, including the Debtor's Complaint and Kahlow and OMC's Cross-Complaint, will be dismissed with prejudice within five (5) business days.

17. The Debtor supports the Settlement Agreement and believes that it constitutes a reasonable resolution of the various disputes among the Parties.

SMRH:479520541.2

-4-

18. The Debtor believes that its allegations in the Complaint support its position and that, if the litigation were to continue and if these allegations were proven, the Debtor would be successful in obtaining a judgment on the Complaint in its favor.

19. The Debtor has vehemently disputed the allegations made against it in the Cross-Complaint and feels confident that, if it were to litigate these issues, it would ultimately succeed.

20. After an initial investigation, however, the Debtor has concluded that, while the probability of success in these matters is fairly good, the cost savings associated with the Settlement counsel in favor of settlement. The remaining estate assets consist of the $200,000 balance from the sale of the Debtor's assets, and the costs of litigation through conclusion would likely exhaust all such funds.

21. The Debtor is not confident that, if it prevailed in the litigation, it could collect significant amounts from the defendants.

22. The Debtor believes that the Settlement generates significant benefits to the estate and its creditors. The Settlement allows the Debtor to avoid long, costly, and risky litigation. The Settlement preserves the funds remaining from the Debtor's sale of its assets for the benefit of its creditors. Also, the Settlement will clear the path for the Debtor to seek the dismissal of this case and likely facilitate a speedier distribution to creditors in conjunction with the dismissal.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 3, 2016.

*Ingrid Sanders*
_____
Ingrid Sanders